IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                    No. 19-po-3592 SMV-1

EREANE REYES-MONTANO,

    Defendant.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE CRIMINAL COMPLAINT, GRANTING PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE DURESS DEFENSE, AND DENYING PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S EXPERT REPORT**

THIS MATTER is before the Court on Defendant's Motion to Dismiss the Criminal Complaint [Doc. 13], filed on January 28, 2020. In its Trial Brief, filed on February 7, 2020, the United States responded to Defendant's Motion. [Doc. 19] at 3–7. The United States also moved to exclude Defendant's anticipated duress defense and moved to strike Defendant's Expert Report. *Id.* at 7–12. Defendant never filed a reply in support of her Motion to Dismiss or filed a response to the United States' Trial Brief. No further briefing is needed to decide the instant Motions. The Court held oral argument on the Motions on February 12, 2020. [Doc. 24] (clerk's minutes). The Court has considered the briefing, the relevant portions of the record, the relevant law, and the oral argument. Being otherwise fully advised in the premises, the Court finds that (i) Defendant's Motion to Dismiss is not well taken and will be denied, and (ii) the United States' Motions in Limine to Exclude Duress Defense is well taken and will be granted, and (iii) the United States' Motion to Strike Defendant's Improper Expert Report is not well taken and will be denied.

## BACKGROUND

The United States charges Defendant with one count of illegally entering or attempting to enter the United States in violation of 8 U.S.C. § 1325(a). [Doc. 1]. Defendant is a citizen of Cuba. *Id.* at 1. She lived in Cuba until May or June of 2019. *See* [Doc. 13] at 1–6. Cuban authorities accused her of participating in anti-government organizations, then allegedly physically and emotionally abused her. *Id.* at 2–6. In May or June of 2019, Defendant fled to Mexico, intending to move to the United States and seek asylum. *Id.* at 6. She arrived in Ciudad Juárez, Mexico, shortly before attempting to seek asylum in the United States. *Id.*

Defendant applied for asylum on June 15, 2019, in El Paso, Texas. *Id.* Immigration officials took her application and told her to return to Mexico, giving her dates and times to return to El Paso for court proceedings related to her asylum application. *See id.* The officials told her to stay in Juárez until the United States could process her application. *Id.*

Defendant obtained a job in Juárez approximately one month later. *Id.* at 7. Her boss "told her that [Juárez] was very dangerous, especially for Cubans." *Id.* He "told [her] to be careful of the narcos, who kidnap Cubans and demand money from their families." *Id.* at 8. He warned her that if the families do not send the money, the cartels would either kill the Cubans or force them to smuggle drugs into the United States. *Id.* In October of 2019, six men arrived at Defendant's place of employment and implied that they wanted to buy Defendant. *See id.* Defendant stated that she "[was] not on sale." *Id.* Her boss told her, "[Y]ou don't know what you just did. You don't play with those kinds of people." *Id.*

After this conversation, Defendant saw two of the six men watching her and following her "wherever she went." *Id.* By October 22, 2019, "all six guys were stalking her." *Id.* at 9. On

December 10, 2019, Defendant attempted to cross the bridge between Juárez and El Paso to report for a court hearing in the United States. *Id.* "She saw all six men and her boss on the Mexican side of the bridge to [Juárez] watching everyone walk to court." *Id.* She became "very afraid" upon seeing the men, "fear[ing] for her life." *Id.* Defendant "ran to an open market at another place, and . . . got lost in the crowd." *Id.* She then went to a hotel to decide how to handle her situation. *Id.* Her boss called her while she was at the hotel, asking where she was. *Id.* She told him that she was not in Juárez. *Id.*

On December 15, 2019, U.S. Border Patrol agents apprehended Defendant in Sunland Park, New Mexico, after tracking her as she illegally crossed the United States-Mexico border. [Doc. 19] at 2. "Defendant admitted to being a citizen of Cuba without authorization to enter or remain in the United States." [Doc. 1] at 1. On December 17, 2019, the United States charged Defendant with illegally entering the United States. *Id.*

Defendant moved to dismiss the Complaint on January 28, 2020. [Doc. 13]. She argues that her prosecution violates Article 31(1) of the Convention Relating to the Status of Refugees ("the Convention"). *Id.* at 10–12. In her Motion, she also states that she intends to argue at trial that she entered the United States under duress. *Id.* at 13. She attaches an expert report from Professor Jeffrey Slack detailing the violence Cubans suffer if they remain in Juárez. [Doc. 13-2]. Defendant filed her Notice of Duress Defense on February 4, 2020. [Doc. 16]. The United States filed its Trial Brief on February 7, 2020, in which it argues that (i) Article 31(1) does not shield Defendant from prosecution, (ii) the Court should preclude her from arguing that she illegally entered the United States under duress, and (iii) the Court should strike Slack's report. [Doc. 19] at 3–13.

## ANALYSIS

**A. Defendant does not qualify for protection from prosecution under Article 31(1) because (i) Article 31(1) does not create an enforceable right for a refugee to be free from prosecution, and (ii) she did not come to the United States directly from Cuba.**

Defendant argues that Article 31(1) of the Convention precludes the United States from prosecuting her for illegal entry because she is a refugee who came to the United States from Cuba after receiving threats against her life and/or freedom. [Doc. 13] at 11–12. The United States contends that Article 31(1) does not create any enforceable rights for Defendant, and that even if it did, Defendant has failed to establish two elements of an Article 31(1) defense. [Doc. 19] at 3–7. For the following reasons, the Court finds that (i) Article 31(1) does not create an enforceable right for Defendant to be free from prosecution, and (ii) even if it did, Defendant would fail to establish that the Article 31(1) defense applies to the circumstances of this case.

**1. Article 31(1) does not create an enforceable right for Defendant to be free from prosecution because it is not a self-executing treaty and Congress has not statutorily adopted Article 31(1)'s language.**

Under the Supremacy Clause, "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Yet, not all treaties create binding law in the United States. "[The Supreme] Court has long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." *Medellin v. Texas*, 552 U.S. 491, 504 (2008). International law refers to the former treaties as self-executing treaties and the latter as non-self-executing treaties. *See id.* at 504–05. A treaty is self-executing "when it 'operates of itself without the aid of any legislative provision.'" *Id.* at 505 (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 315 (1829), *overruled on*

4

*other grounds by United States v. Percheman*, 32 U.S. (7. Pet.) 51 (1833)). A self-executing treaty automatically becomes a part of U.S. law, while a non-self-executing treaty creates no enforceable right unless Congress passes a law creating such a right. *See id.* ("[W]hile treaties 'may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing" and is ratified on these terms.'" (quoting *Igartua-De La Rose v. United States*, 417 F.3d 145, 150 (1st Cir. 2005))).

In order to determine whether a treaty is self-executing, a court must interpret it. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin*, 552 U.S. at 506. "When the text is clear, [courts] interpret it as written." *Marquez-Ramos v. Reno*, 69 F.3d 477, 480 (10th Cir. 1995). When a treaty's text is unclear or ambiguous, a court may properly consider the treaty's negotiation and drafting history and "'the postratification understanding' of signatory nations." *Medellin*, 552 U.S. at 507 (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)); *see Marquez-Ramos*, 69 F.3d at 480.

The Convention provides certain protections for refugees seeking asylum. Although the United States is not a signatory to the Convention, it is bound to comply with it pursuant to its accession to the United Nations Protocol Relating to the Status of Refugees. *I.N.S. v. Stevic*, 467 U.S. 407, 416 (1984); *United States v. Rojas-Marcano*, No. 18-po-0130 GBW-1, 2018 WL 1033200, at *2 (D.N.M. Feb. 22, 2018). Article 31(1) of the Convention provides:

> The contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees, who, coming directly from a territory where their life or freedom was threatened . . . enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

Convention Relating to the Status of Refugees art. XXXI(1), July 28, 1951, 189 U.N.T.S. 137. Defendant points to no language in Article 31(1) or the Convention in general suggesting that this provision is enforceable without congressional action. Nor does the legislative history of the Convention compel a different outcome. Officials did not believe that signing the Convention would require any changes in U.S. immigration policy, as U.S. immigration law was largely consistent with the Convention at the time the United States ratified it. *See Stevic*, 467 U.S. at 429 n.22; *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009); *Pierre v. United States*, 547 F.2d 1281, 1287–89 (5th Cir. 1977), *vacated on other grounds*, 434 U.S. 962 (1977). As proponents of the Convention believed that preexisting statutes covered its subject area, they did not believe that the Convention was independently enforceable. *See Stevic*, 467 U.S. at 429 n.22.

Defendant presents one argument suggesting that Article 31(1) confers an enforceable right for her to be free from prosecution. She argues that the term "immigration law" in 8 U.S.C. § 1101(a)(17) includes "all 'laws, conventions, and *treaties* . . . relating to the immigration, exclusion, deportation, expulsion, or removal of aliens.'" [Doc. 13] at 12 (quoting 8 U.S.C. § 1101(a)(17) (2018)). She reasons that U.S. immigration law includes the Convention. *Id.* The Court disagrees. Simply because an immigration statute defines a term of art to include treaties does not mean that all immigration-related treaties automatically become a part of codified U.S. immigration law.

Nearly every court to decide this issue has held that the Convention is not self-executing. *See, e.g.*, *Cazun v. Att'y Gen. U.S.*, 856 F.3d 249, 257 n.16 (3d Cir. 2017) (characterizing the Convention as a "non-self-executing treaty"); *Khan*, 584 F.3d at 783; *Haitian Refugee Ctr., Inc v.*

*Baker*, 949 F.2d 1109, 1110 (11th Cir. 1991); *Pierre*, 547 F.2d at 1287–89; *Bertranda v. Sava*, 684 F.2d 204, 218–19 (2d Cir. 1982); *United States v. Guevara-Medina*, No. 18-mj-9443 BTM, 2018 WL 3970092, at *1 (S.D. Cal. Aug. 20, 2018); *United States v. Munoz*, No. CR-17-1078 PHX DGC, 2017 WL 4922047, at *3 (D. Ariz. Oct. 30, 2017).[1] Numerous courts have denied a defendant's motion to dismiss in an illegal-entry case for this reason. *See, e.g.*, *United States v. Malenge*, 294 F. App'x 642, 643–44 (2d Cir. 2008); *United States v. Velazuqez-Hernandez*, No. 19CR03066-KSC, 2020 WL 475272, at *6–7 (S.D. Cal. Jan. 28, 2020); *Guevara-Medina*, 2018 WL 3970092, at *1; *Munoz*, 2017 WL 4922047, at *3. Therefore, the Court finds that the Convention is a non-self-executing treaty. It confers no rights upon Defendant absent congressional action. As no statute codifies Article 31(1)'s language, Defendant cannot rely upon it to argue that her prosecution violates the Convention.

2. **Even if Article 31(1) applied, Defendant does not enjoy its protection because (i) she did not come to the United States directly from Cuba, and (ii) her factual allegations fail to show that she presented herself without delay to U.S. authorities.**

Article 31(1) applies only when: "[i] the party seeking relief is a 'refugee'; [ii] the refugee came to the United States directly from the territory from which [s]he fled; [iii] the refugee presented [herself] without delay to the authorities; and [iv] the refugee has good cause for [her] unlawful entry or presence." *Rojas-Marcano*, 2018 WL 1033200, at *2.

Defendant's Article 31(1) defense fails because she did not come to the United States directly from Cuba, i.e., the territory from which she was fleeing persecution. Rather, she entered

---

[1] *But see United States v. Malenge*, 472 F. Supp. 2d 269, 273 (N.D.N.Y. 2007); *Fernandez-Roque v. Smith*, 539 F. Supp. 925, 935 (N.D. Ga. 1982) (stating in dicta that the court "inclines toward [the] view" that Article 31 is self-executing).

from Mexico. After fleeing Cuba, she traveled to Juárez in May or June of 2019. [Doc. 13] at 6–7. She remained in Mexico through December of 2019. *See id.* at 6–9. Only after residing in Mexico for several months did she illegally enter the United States. *See id.* at 9–10. Because she did not come to the United States directly from Cuba, but instead lived in Mexico for approximately six months before entering the United States, she did not "com[e] directly" from the territory where her life or freedom was threatened, i.e., Cuba.[2] Convention Relating to the Status of Refugees art. XXXI(1); *see Rojas-Marcano*, 2018 WL 1033200, at *2 (holding the defendant did not come to the United States directly from Venezuela, the territory from which he had fled, because he had entered the United States from Mexico).

At oral argument, Defendant argued that even if she did not come directly from Cuba, she came directly from "a territory where [her] life or freedom was threatened"—Mexico. Convention Relating to the Status of Refugees art. XXXI(1), 189 U.N.T.S. 137. Yet, Defendant is not a "refugee" from Mexico. She argues, "[t]he term refugee means . . . any person who is outside any country *of such person's nationality* . . . and who is unable or unwilling to return to, and is unable or unwilling to avail [herself] of the protection of *that country* . . . ." [Doc. 13] at 12 (emphasis added) (citing 8 U.S.C. 1101(a)(42)). Defendant is Cuban; no allegation suggests that she is

---

[2] Defendant argues that she need not come to the United States directly from Cuba to enjoy the Article 31(1) defense. She contends that U.N. Guidelines on interpreting Article 31 state that Article 31(1) covers a person who transits an intermediate country "for a short period of time" without having received asylum there. [Doc. 13] at 11 (quoting Office of the United Nations High Commissioner for Refugees, Geneva, *UNHCR Revised Guidelines Applicable Criteria and Standards Relating to the Detention of Asylum Seekers* (February 26, 1999) [hereinafter *Guidelines*], https://www.refworld.org/docid/3c2b3f844.html). Defendant therefore argues that her residing in Mexico does not prevent her from receiving Article 31(1)'s protection. *See* [Doc. 13] at 12. The Court disagrees. The Guidelines state that Article 31(1) only protects an alien residing in an intermediary country for a "short period of time." *Guidelines* at 2. The Guidelines elaborate, "No strict time limit can be applied to the concept of 'coming directly' and each case must be judged on its merits." *Id.* The Court finds that Defendant's six-month stay in Mexico does not constitute a "short period of time," *id.*, and she therefore did not come directly to the United States from Cuba.

Mexican.  *See* [Doc. 1] at 1.  She is a refugee of Cuba, not Mexico.  Therefore, Article 31(1) does not protect her from the alleged threat of violence in Mexico.

Additionally, Defendant's Article 31(1) defense fails because no factual allegation suggests that she presented herself to authorities without delay.  The Complaint simply alleges that a Border Patrol agent "encountered . . . Defendant in Doña Ana County, New Mexico," without detailing how the agent encountered her.  [Doc. 1] at 1.  Defendant's affidavit in support of her Motion to Dismiss merely states that she "[is] now detained for attempting to illegally enter the [United States]."  [Doc. 13-1] at 10.  Nowhere in her briefing does she allege that she presented herself to authorities without delay.[3]  Because no factual allegation supports this element of an Article 31(1) defense, the Court will deny her Motion to Dismiss.

As Defendant fails to establish two of the four elements of an Article 31(1) defense, the Court will deny her Motion to Dismiss.

**B.    The Court will exclude Defendant's duress defense because (i) her proffer of evidence fails to establish that she received an imminent threat of death or serious bodily injury, and (ii) her proffer of evidence fails to establish that she had no reasonable opportunity to escape the threatened harm.**

Defendant intended to argue at trial that she entered the United States illegally under duress.  [Doc. 16].  She proffered that she felt threatened by her boss and six other men in Juárez who caused her to fear that if she stayed in Juárez, they would harm her.  *Id.* at 4–6.  The United States argued that Defendant failed to proffer evidence establishing that she received an imminent

---

[3] Though defense counsel stated at oral argument that Defendant presented herself without delay to authorities upon entering the United States, without factual allegations to support this statement the Court rejects it as conclusory.

9

threat and had no reasonable opportunity to escape the threat. [Doc. 19] at 8–10. The Court agrees with the United States.

If a defendant wishes to present an affirmative defense at trial, she "bears the burden of proffering testimony [before trial] that meets a 'minimum standard as to each element so that, if a jury finds it to be true, it would support an affirmative defense—here, that of duress.'" *United States v. Thomas*, No. 18-cr-0458 WJ, 2018 WL 4510256 (D.N.M. Sept. 20, 2018) (quoting *United States v. Bailey*, 444 U.S. 394, 398 (1980)). "[I]f the [proffered] evidence is insufficient on even one element, 'the trial court and jury need not be burdened with testimony supporting other elements of the defense.'" *United States v. Portillo-Vega*, 478 F.3d 1194, 1197–98 (10th Cir. 2007) (quoting *Bailey*, 444 U.S. at 416); *cf. United States v. Al-Rekabi*, 454 F.3d 1113, 1122 (10th Cir. 2006) ("To qualify for an instruction on an affirmative defense such as necessity a defendant must produce evidence of each element sufficient to warrant its consideration by the jury.").

"The defendant bears the burden of proving [the duress] defense by a preponderance of the evidence." *Portillo-Vega*, 478 F.3d at 1197. A defendant must establish three elements to enjoy the duress defense: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *Id.* (quoting *United States v. Merchant*, 992 F.2d 1091, 1096 (10th Cir. 1993)).

Defendant's proffer of testimony in support of her duress defense fails to establish the first and third elements. First, Defendant's proffer fails to establish that the men conveyed an immediate threat of death or serious bodily injury to her. Courts universally agree that "[e]vidence of a mere 'generalized fear' does not satisfy the requirement of a well-founded fear of [imminent] death or serious bodily harm; rather, there must have been a threat that was specific and prospects

of harm that were immediate." *United States v. Stevens*, 985 F.2d 1175, 1182 (2d Cir. 1993). An abstract "[f]ear of future harm does not satisfy the present, imminent, and impending threat requirements" of the duress defense. *United States v. Ramirez-Chavez*, 596 F. App'x 290, 293 (5th Cir. 2015). Instead, "[t]he defendant must produce evidence that [s]he 'was in danger of imminent bodily harm *at the moment* [s]he [committed the offense].'" *Id.* (fourth alteration in original) (quoting *United States v. Harper*, 802 F.2d 115, 118 (5th Cir. 1986)); *see Al-Rekabi*, 454 F.3d at 1125 (holding that, under the necessity defense, an "imminent" harm requires more than a "potentially very dangerous" threat)[4]; Wayne R. LaFave, 2 Subst. Crim. L. § 9.7(b) (3d ed. 2019) ("Threatened *future* death or serious bodily harm . . . will therefore not suffice.").

For these reasons, in similar circumstances, the Ninth Circuit has looked for "evidence of a figurative gun to [the defendant's] . . . head compelling his illegal entry." *United States v. Vasquez-Landaver*, 527 F.3d 798, 803 (9th Cir. 2008). In *United States v. Marceleno*, the Tenth Circuit held that, if credible, the defendant's story could establish a duress defense to illegal entry. 819 F.3d 1267, 1273–74 (10th Cir. 2016). Marceleno testified that he was brought to the United States from Mexico against his will by a group of human traffickers. *Id.* at 1270. Part way through the journey, he told them that he "could not continue because of his poor health." *Id.* at 1270. "One of his smugglers then threatened to stab him if he did not continue . . . ." *Id.* at 1270. He took the threat seriously and continued on, though he had no desire or intention to cross the border. *Id.* at 1271. The Tenth Circuit held that the defendant's version of events, if found credible,

---

[4] The Court may look to cases discussing the necessity defense as persuasive authority because the traditionally separate defenses of necessity and duress have become blurred to the point of merger. *United States v. Butler*, 485 F.3d 569, 572 n.1 (10th Cir. 2007).

11

established the duress defense. *Id.* at 1273. "[T]he smuggler's purported threat of stabbing was not directed at someone in the future, but rather was immediate." *Id.* at 1274. Moreover, "the interaction was in an isolated environment, and came from an individual engaged in illegal human trafficking." *Id.*

Here, Defendant alleges that months before she illegally crossed the border her boss told her that "[y]ou don't play with those kinds of people [the cartel]." [Doc. 16] at 4. She also alleges that she saw between two and seven men watching her and stalking her. *Id.* at 4. As she walked to the bridge between the United States and Mexico for her December 10, 2019 court hearing, she saw the seven men waiting on the bridge. *Id.* at 5. Once she saw the men, she "feared for her life," *id.* at 5, because she knew that the cartels kidnap and kill Cubans in Juárez, *id.* at 4–5.

Defendant argues that two types of fears caused her to cross the United States-Mexico border: (i) a fear of the cartel based on the men stalking her and her boss's statement that they were dangerous, and (ii) a fear that the men on the bridge would harm her if she attempted to cross it. Her fears have some basis: Reports of cartel violence in Juárez, especially against Cubans, are common, *see* [Doc. 13-2] at 5–15, and her boss had warned her that the men were dangerous, *see* [Doc. 16] at 4. However, for the following reasons, these fears do not rise to the level of an imminent threat under the duress defense.

Defendant's fear of the cartel does not rise to the level of an immediate threat. She does not allege that the men were stalking her when she crossed into the United States, or that they attempted to buy her when she illegally crossed the border. Unlike the stabbing threat in *Marceleno*, those threats came days or months before she crossed the border. In this case, without a specific, imminent threat against Defendant, a generalized fear of the cartel does not establish

12

that she suffered from the type of threat recognizable under the duress defense. *See United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990) ("[The defendant] failed to present evidence of more than a generalized fear, based on the reputation of the Colombian cartels, that caused him to [commit the crime]. He did not identify any . . . specific threats by anyone . . . . In short, [the defendant] made no showing of a well-founded fear of imminent death or serious bodily harm."); *United States v. Godinez-Oseguera*, No. CR11-5545BHS, 2012 WL 751011, at *3 (W.D. Wash. Mar. 8, 2012) (rejecting a duress defense in a § 1326 case because though "drug cartels and gang violence are pervasive in Mexico . . . Defendant's fear of [the drug cartel] is based ultimately on a speculative threat does not appear specifically directed at Defendant"); *see also United States v. Howe*, 289 F. App'x 74, 78 (6th Cir. 2008) (holding that "generalized" threats concerning "a pervasive atmosphere of violence within [a] prison," including "the presence of gangs," does not "establish the presence of an imminent or immediate threat necessary for a defense of duress").[5]

Similarly, Defendant's proffered evidence fails to show that the men on the bridge conveyed to her an imminent threat. The men's mere presence on the bridge does not convey an imminent threat of death or serious bodily injury. Defendant does not even articulate the exact threat the men allegedly expressed to her. *See Stevens*, 985 F.2d at 1182 (requiring the defendant to articulate the *specific* threat of death or serious bodily harm). Moreover, Defendant does not allege that these men even saw her as she approached the bridge. The men did not follow her when

---

[5] Though not expressly argued, Defendant also seems to contend that she illegally entered the United States under duress from authorities in Cuba, who allegedly intended to jail her if she remained there. *See* [Doc. 16] at 5. Even if Cuban authorities threatened Defendant with serious injury or death, such a threat was not imminent when, months later, she illegally entered the United States. *See United States v. Vasquez-Landaver*, 527 F.3d 798, 804 (9th Cir. 2008) (finding that a defendant who fled from El Salvador based on threats from police there could not establish a duress defense because the threat in El Salvador was no longer immediate once he traveled outside El Salvador).

she fled the bridge, and when she ran away from the bridge, she "got lost in the crowd." *Id.* at 5. Defendant then waited five days before illegally entering the United States. *See* [Doc. 19] at 2. Unlike *Marceleno*, where the smuggler told the defendant that he would stab him if the defendant did not continue walking, Defendant does not allege that she ever saw the men—or that they physically interacted with her in any way—after she lost them in the crowd five days prior to her illegal entry. Defendant's proffer of evidence therefore fails to establish that the men conveyed to her an imminent threat. *See Ramirez-Chavez*, 596 F. App'x at 293 (holding that a previously captured defendant had not shown that an imminent threat caused him to illegally enter the United States because the defendant had escaped from his captors and the captors "were not in hot pursuit" of him "at the time he . . . illegally entered the United States"); *Vasquez-Landaver*, 527 F.3d at 803 (holding that a person who illegally entered the United States had not proffered sufficient evidence suggesting that he "was escaping an immediate threat of harm when he . . . cross[ed] the border").

Second, Defendant's proffer of evidence fails to establish that she had no reasonable opportunity to escape the threatened harm. By Defendant's own account, she had, in fact, escaped the seven men well before she illegally crossed into the United States. After she saw them at the bridge, she ran into a market, "got lost in the crowd," stayed at a hotel, waited five days, and *then* entered the United States. [Doc. 16] at 5; *see* [Doc. 1] at 1. She does not allege that she saw the men after she ran away from the bridge. Defendant had a reasonable opportunity to escape, and did escape, any allegedly imminent threat conveyed by the men on the bridge.

For the above reasons, the Court will grant the United States' Motion in Limine to Exclude the Duress Defense. The United States also moves to strike Defendant's expert report from Professor Jeremy Slack. [Doc. 19] at 11–12. Defendant offers Slack's report in support of her

duress defense; he generally avers that Cubans face violence from cartels in Juárez and that the authorities cannot stop this violence. *See* [Doc. 13-2] at 2, 5–15. Because the Court has considered Slack's report in determining whether Defendant' proffered evidence justified a duress instruction at trial, the Court will deny the United States' Motion to Strike.

## CONCLUSION

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Defendant's Motion to Dismiss the Criminal Complaint [Doc. 13] is **DENIED**.

**IT IS FURTHER ORDERED** that the United States' Motion in Limine to Exclude the Duress Defense [Doc. 19] at 10–11 is **GRANTED**.

**IT IS FURTHER ORDERED** that the United States' Motion to Strike Improper Expert Report [Doc. 19] at 11–12 is **DENIED**.

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**